IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ARTHUR HOYTE, M.D., on behalf of himself and all others similarly situated, and in the interests of the general public,

Plaintiff,

v.

YUM! BRANDS, INC. d/b/a KFC,

Defendant.

Civil Action No. 06-1127 (JR)

**MOTION TO DISMISS**

PLEASE TAKE NOTICE that, upon the accompanying Declaration of Erich O. Grosz, dated August 3, 2006, together with the exhibits attached thereto, the Statement of Points and Authorities in Support of Yum! Brands, Inc.'s Motion to Dismiss, and all the other papers and proceedings had herein, defendant Yum! Brands, Inc., will move this Court, pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure, at a

time and place to be set by the Court, for an Order dismissing the Complaint, with prejudice and without leave to replead.

Dated: New York, New York
August 3, 2006

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

/s/ Roger E. Podesta
By: Roger E. Podesta
Mark P. Goodman
Erich O. Grosz
(admitted pro hac vice)

919 Third Avenue
New York, N.Y. 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

/s/ Ada Fernandez Johnson
By: Ada Fernandez Johnson
(Bar No. 463296)

555 12th St., N.W.
Suite 1100E
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383-8118

Attorneys for Defendant Yum! Brands, Inc.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ARTHUR HOYTE, M.D., on behalf of himself and all others similarly situated, and in the interests of the general public, | ) | |
| Plaintiff, | ) | Civil Action No. 06-1127 (JR) |
| v. | ) | |
| YUM! BRANDS, INC. d/b/a KFC, | ) | |
| Defendant. | ) | |

STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF YUM! BRANDS, INC.'S MOTION TO DISMISS

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, N.Y. 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

555 12th St., N.W.
Suite 1100E
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383-8118

Attorneys for Defendant Yum! Brands, Inc.

Dated: August 3, 2006

Table of Contents

Page

PRELIMINARY STATEMENT ....................................................................................... 1

BACKGROUND ........................................................................................................ 7

ARGUMENT ............................................................................................................. 9

I. Plaintiff's Implied Warranty And DCCPPA Claims Should Be Dismissed Because KFC Had No Duty To Affirmatively Disclose Any Ingredients, Much Less Trans Fat Content. ........................................ 10

A. The Law Of Implied Warranty Imposed No Duty To Disclose ............................ 10

B. The DCCPPA Imposed No Duty To Disclose. ...................................................... 13

II. Plaintiff's Negligent Misrepresentation Claim Fails Either To Satisfy The Pleading Requirements Of Rule 9(b) Or To State A Claim Under Rule 12(b)(6) ............ 18

A. The Negligent Misrepresentation Claim Lacks The Requisite Particularity. ........ 18

B. Plaintiffs' Allegations Of Misrepresentation Fail To State A Claim ..................... 19

1. The Assertion That KFC Provides The "Best Food" Is Non-Actionable Puffery. ........................................ 21

2. The Assertion That KFC Food Products Can Be Consumed As Part Of A Healthy Lifestyle Is Not An Actionable Misrepresentation. ............ 22

III. Plaintiff's Implied Warranty Claim Should Be Dismissed For Multiple Additional Reasons. .......................................................... 23

A. Plaintiff Fails To Identify The Food That He Purchased ...................................... 24

B. Plaintiff's Allegations Do Not Support His Assertion That Whatever Food He Did Purchase Was Non-Merchantable. ........................................ 25

C. Plaintiff Does Not Properly Plead Any Legally Cognizable Injury. ..................... 27

IV. Plaintiff's Claim Under The DCCPPA Fails For Multiple Additional Reasons. .............. 28

A. Plaintiff Has Not Alleged Any Injury-In-Fact And Therefore Lacks Standing. ......................................................... 29

B. KFC's Supposed Omission Did Not "Tend To Mislead" Consumers Into Believing That Its Foods Were Free Of Any Trans Fat Content. .......................... 31

Table of Contents
(continued)

Page

C. Federal Law Preempts Plaintiff's Claims For Prospective Injunctive Relief.....32

CONCLUSION.....36

## TABLE OF AUTHORITIES

### FEDERAL CASES

All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862 (7th Cir. 1999) ....21

American Italian Pasta Co. v. New World Pasta Co., 371 F.3d 387 (8th Cir. 2004) ....21

Anderson v. USAA Casualty Insurance Co., 221 F.R.D. 250 (D.D.C. 2004) ....18

Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133 (C.D. Cal. 2005) ....29

Brown v. U.S., 271 F. Supp. 2d 225 (D.D.C. 2003) ....1

Cephas v. MVM, Inc., 403 F. Supp. 2d 17 (D.D.C. 2005) ....1

Colacicco v. Apotex, Inc., 432 F. Supp. 2d 514 (E.D. Pa. 2006) ....34

Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv., 911 F.2d 242 (9th Cir. 1990) ....22

Freightliner Corp. v. Myrick, 514 U.S. 280 (1995) ....35

Fuller Brothers Inc. v. Int'l Marketing, 928 F. Supp. 1042 (D. Or. 1996) ....29

Geier v. American Honda Motor Co., 529 U.S. 861 (2000) ....32, 35

I. Meyer Pincus & Associate, P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759 (2d Cir. 1991) ....20

In re Olson, 884 F.2d 1415 (D.C. Cir. 1989) ....12

In re Telecom Ltd. Securities Litigation, No. 93 Civ. 4384, 1994 U.S. Dist. LEXIS 11730 (S.D.N.Y. Aug. 22, 1994) ....21

In re U.S. Office Products Co. Sec. Litigation, 251 F. Supp. 2d 58 (D.D.C. 2003) ....18

Industrial Truck Association, Inc. v. Henry, 125 F.3d 1305 (9th Cir. 1997) ....34

Kowal v. MCI Communications Corp., 16 F.3d 1271 (D.C. Cir. 1994) ....9

Krooth & Altman v. N. America Life Assurance Co., 134 F. Supp. 2d 96 (D.D.C. 2001) ....1

Lipton v. Nature Co., 71 F.3d 464 (2d Cir. 1995) ....22

Major v. Plumbers Local Union No. 5, 370 F. Supp. 2d 118 (D.D.C. 2005) ....................26

Marshall Cty. Health Care Authority v. Shalala, 988 F.2d 1221 (D.C. Cir. 1993) .............1

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996) ....................................................................34

Midwest Printing, Inc. v. AM International, Inc., 108 F.3d 168 (8th Cir. 1997) .............21

N. Am. Catholic Edu. Programming Foundation, Inc., v. F.C.C., 437 F.3d 1206 (D.C. Cir. 2006)..............................................................................................16

National Home Equity Mortgage Association v. Office of Thrift Supervision, 271 F. Supp. 2d 264 (D.D.C. 2003) ......................................................................34

Papike v. Tambrands, Inc., 107 F.3d 737 (9th Cir. 1997) .................................................34

Pelman v. McDonald's Corp., 237 F. Supp. 2d 512 (S.D.N.Y. 2003) .................12, 23, 26, 27

Phillips v. Bureau of Prisons, 591 F.2d 966 (D.C. Cir. 1979) .............................................1

Public Citizen, Inc. v. Shalala, 932 F. Supp. 13 (D.D.C. 1996) .......................................14

Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315 (5th Cir. 2002)...............................30

Rodriguez v. P.R. Federal Affairs Admin., 435 F.3d 378 (D.C. Cir. 2006)......................16

Washington Post v. Robinson, 935 F.2d 282 (D.C. Cir. 1991) ........................................12

Wells v. Allstate Insurance Co., No. 00-0760, 2006 U.S. Dist. LEXIS 4694 (D.D.C. Jan. 24, 2006) ..........................................................................................14

Weyrich v. The New Republic, Inc., 235 F.3d 617 (D.C. Cir. 2001)................................10

Williams v. Gerber Products Co., No. 05 Civ. 1278, 2006 U.S. Dist. LEXIS 52594 (S.D. Cal. May 24, 2006) ...............................................................22, 30, 31

Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171 (D.D.C. 2003) .................14, 28, 29, 30, 31

**STATE CASES**

Brennan v. Shepherd Park Pharmacy, 138 A.2d 494 (D.C. 1958) ...................................26

Brown v. McDonald's Corp., 101 Ohio App. 3d 294 (Ohio Ct. App. 1995).....................11

Desatnik v. Lem Motlow, Prop., Inc., 1986 Ohio App. LEXIS 5240, 84 C.A. 104 (Oh. Ct. of App. Jan. 9, 1986) ....................12

Edwards v. Hop Sin, Inc., 140 S.W.3d 13 (Ky. Ct. App. 2003) ....................11

Evans v. Taco Bell Corp., No. 04-CV-103, 2005 WL. 2333841 (D.N.H. Sept. 23, 2005) ....................22

Hakki v. Zima Co., No. 03-9183, 2006 WL. 852126 (D.C. Super. Ct. 2006) ....................29

Hall v. Ford Enterprises, Ltd., 445 A.2d 610 (D.C. 1982) ....................18, 21

Harrison v. Canada Dry Corp., 245 A.2d 642 (D.C. 1968) ....................27

Hochberg v. O'Donnell's Restaurant, Inc., 272 A.2d 846 (D.C. 1971) ....................25

Livingston v. Marie Callenders, Inc., 72 Cal. App. 4th 830 (Cal. Ct. App. 1999) ....................11

Morris v. Adolph Coors Co., 735 S.W.2d 578 (Tex. Ct. App. 1987) ....................13

Payne v. Soft Sheen Products, Inc., 486 A.2d 712 (D.C. 1985) ....................27

Settles v. Redstone Development Corp., 797 A.2d 692 (D.C. 2002) ....................10

**FEDERAL STATUTES AND LEGISLATIVE MATERIALS**

21 C.F.R. § 101.9 ....................14

21 C.F.R. § 101.10 ....................15, 33, 34

21 C.F.R. § 101.13 ....................32

21 C.F.R. § 101.45 ....................33, 34, 35

21 U.S.C. § 343 ....................14, 32, 33, 34

21 U.S.C. § 343-1 ....................32, 33, 34

21 U.S.C. § 360 ....................34

Food Labeling: Trans Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and Health Claims, 68 Fed. Reg. 41434 (Jul. 11, 2003) (to be codified at 21 C.F.R pt. 101) ....................7, 14, 15, 33, 34

**STATE STATUTES**

D.C. Code § 28:2-312 .....29

D.C. Code § 28:2-313 .....22

D.C. Code § 28:2-318 .....29

D.C. Code § 28-3904 .....29

D.C. Code § 28-3905 .....16

D.C. Code § 28:2-314 .....25

D.C. Code § 28-3904 .....4, 13, 31

D.C. Mun. Regs. title 25, § 1102 .....15

D.C. Mun. Regs. title 25, § 9901 .....15

U.C.C. § 2-314 .....25, 27

**TREATISES AND SECONDARY SOURCES**

29 Am. Jur. 2d Evidence § 33 (2006) .....12

Am. Law of Products Liability 3d, § 26:13 (2006) .....21

31A C.J.S. Evidence § 10 (2006) .....12

Restatement (Second) of Torts, §402A .....11, 12

Standardized Civil Jury Instructions for the District of Columbia, §23.02[1] .....25

STATEMENT OF POINTS AND AUTHORITIES
IN SUPPORT OF YUM! BRANDS, INC.'S MOTION TO DISMISS

Defendant Yum! Brands, Inc. ("KFC") submits this Statement of Points and Authorities in support of its motion to dismiss the Complaint of plaintiff Arthur Hoyte, M.D., dated June 12, 2006 (the "Complaint"), pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b).

PRELIMINARY STATEMENT

Having failed to convince the Food and Drug Administration or legislators at the federal or state level to ban the use of partially hydrogenated vegetable oil in food preparation, the Center for Science in the Public Interest ("CSPI"), an advocacy group serving as counsel for the nominal plaintiff in this action but in many respects the real party in interest, seeks to achieve by litigation what it has been unable to accomplish through the legislative and regulatory processes. According to CSPI, partially hydrogenated vegetable oil, which contains trans fat, "should be removed from the American food supply since safer alternatives are widely available."[1] In the

---

[1] Center for Science in the Public Interest, TransFree America Campaign Launched (May 18, 2004), available at http://cspinet.org/new/200405181.html (attached as Exhibit 9 to Declaration of Erich O. Grosz). On a motion to dismiss, the Court properly may consider documents referred to or relied upon in the complaint. See Cephas v. MVM, Inc., 403 F. Supp. 2d 17, 20 (D.D.C. 2005); Brown v. U.S., 271 F. Supp. 2d 225, 228 (D.D.C. 2003); Krooth & Altman v. N. Am. Life Assurance Co., 134 F. Supp. 2d 96, 99 (D.D.C. 2001). The Court also may refer to materials which are part of the public record. See, e.g., Marshall Cty. Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 971 n.25 (D.C. Cir. 1979). Accordingly, for purposes of this motion, the Court may consider the following documents, copies of which have been attached as exhibits to the accompanying Declaration of Erich O. Grosz and identified herein as "Ex. __":

- U.S. Department of Health and Human Services, Dietary Guidelines for Americans 2005, Ch. 6 ("2005 Dietary Guidelines") (Ex. 1) (public record; referred to at Complaint ¶ 19)
- U.S. Department of Health and Human Services, Guidelines: Aim for Fitness ("HHS Aim For Fitness Statement") (Ex. 2) (public record)

first phase of its war on trans fat, CSPI petitioned the FDA to add trans fat to the list of items that must be disclosed in nutritional labeling for packaged foods, and the FDA responded by issuing new trans fat disclosure regulations that became effective on January 1, 2006. As the next

---

- U.S. Department of Health and Human Services, HHS Unveils FDA Strategy to Help Reduce Obesity (March 12, 2004) ("HHS 3/12/04 Statement") (Ex. 3) (public record)

- U.S. Food and Drug Administration, Questions and Answers about Trans Fat Nutrition Labeling (updated January 1, 2006) ("FDA Trans Fat Q&A") (Ex. 4) (public record)

- U.S. Food and Drug Administration, FDA News: FDA Receives Keystone Forum Report on Away-From-Home Foods (June 2, 2006) ("FDA 6/2/06 Statement") (Ex. 5) (public record)

- National Academy of Sciences / Institute of Medicine Letter Report on Dietary Reference Intakes for Trans Fatty Acids (2002), available at http://www.iom.edu/CMS/5410.aspx ("IOM Report") (Ex. 6) (public record; referred to at Complaint ¶ 20)

- U.S. Food and Drug Administration, Nutrition Subcommittee of the Food Advisory Committee, Summary Minutes of Nutrition Subcommittee, April 27 & 28, 2004, available at http://www.fda.gov/OHRMS/DOCKETS/ac/04/minutes/2004-4035m1-summary.pdf (Ex. 7) (public record; referred to at Complaint ¶ 20)

- Center for Science in the Public Interest, Petition for Rulemaking to Revoke the Authority for Industry to Use Partially Hydrogenated Vegetable Oils in Foods, available at http://cspinet.org/new/pdf/trans_fat_petition_may_18.pdf (submitted to U.S. Food and Drug Administration on May 18, 2004) ("CSPI Petition") (Ex. 8) (public record)

- Center for Science in the Public Interest, TransFree America Campaign Launched (May 18, 2004), available at http://cspinet.org/new/200405181.html (Ex. 9) ("2004 CSPI Press Release") (source of quotation at Complaint ¶ 21)

KFC's website and in-store brochures also may be considered by the Court, as paragraph 28 of the Complaint refers specifically to KFC's representations "both in its stores and on its website" that consumption of its food is consistent with a nutritionally healthy lifestyle, and plaintiff's claim of negligent misrepresentation is based entirely upon KFC's alleged representations about the quality and nutritional value of its food. See Complaint ¶¶ 53-63. The KFC website is available at http://www.kfc.com, with a direct link to its nutritional page at http://www.kfc.com/kitchen/nutrition.htm ("KFC Website") (Ex. 10).

offensive in its campaign, CSPI filed a petition asking the FDA to go even further and impose an outright ban on the use of partially hydrogenated vegetable oils "in both packaged foods and foods served in restaurants and other food-service establishments." CSPI Petition (Ex. 8) at 1-2. This time, however, the FDA did not act on CSPI's request.

CSPI, evidently disappointed that the FDA did not agree to its latest demand, now asks this Court to force enactment of its preferred public policy through the judicial process. In this lawsuit, CSPI has chosen to target the KFC chain of quick-service restaurants because, like thousands of other restaurants and food suppliers, it prepares some foods using partially hydrogenated vegetable oil, and, one assumes, because KFC is an iconic brand. However, even though CSPI launched this lawsuit at a press conference that resulted in substantial publicity, the Complaint is inadequately pled and subject to dismissal on multiple grounds.

The Complaint is brought by plaintiff Arthur Hoyte, M.D., purportedly on behalf of a class consisting of anyone who has purchased any food containing trans fat at a KFC restaurant in the District of Columbia within the limitations period. Plaintiff allegedly purchased several meals at KFC restaurants in the District in 2004 and 2005, received and consumed standard KFC food that was no different than food sold at other KFC restaurants throughout the country, and experienced no adverse effects or personal injuries whatsoever. Plaintiff, a medical doctor of many years' experience, claims to have been unaware at the time of his purchases that some KFC food contains trans fat, although it is common knowledge that fast food can have a high fat content. Stripped to its essentials, the Complaint makes but two allegations of misconduct: that KFC failed to affirmatively disclose that certain of its menu items contained trans fat and that KFC made two statements that misrepresented its food. Plaintiff then conjures from these sparse allegations three causes of action – for breach of the implied warranty of merchantability,

negligent misrepresentation and violation of the D.C. Consumer Protection Procedures Act ("DCCPPA") – none of which states a legally cognizable claim.

Plaintiff's primary claim is that KFC should have affirmatively disclosed at the point of sale that certain of its menu items contained trans fat. Plaintiff claims that this non-disclosure constituted a violation by KFC of its implied warranty of merchantability and of Section 28-3904(f) of the DCCPPA, which prohibits the "fail[ure] to state a material fact if such failure tends to mislead." Both claims fail for want of any legal duty on the part of KFC to make the disclosures sought by plaintiffs.

Nothing in the common law of the District or any other jurisdiction in the United States requires food sellers to disclose ingredients or nutrients that pose a risk of harm, if at all, only if consumed in excessive quantities over an extended period of time. That the common law does not impose such a duty makes particular sense here, both because the potential health risks associated with consuming an excessive quantity of high-fat foods already are widely known and because plaintiff claims no injuries resulting from his alleged consumption of foods containing trans fat.

Nor can the "material fact" clause of the DCCPPA be construed to impose the duty proposed by plaintiff. The DCCPPA is a general anti-fraud statute designed to deter improper or fraudulent trade practices, not to establish nutritional information standards. At the time of plaintiff's purchases, both federal and District regulations exempted restaurants from any obligation to provide nutritional information. In the past four years, the D.C. Council has twice considered but declined to enact legislation that would have required such disclosure by restaurants. Indeed, at the time of plaintiff's purchases, federal and District regulations did not require disclosure of trans fat content even in the labeling of packaged food. Plaintiff now seeks

to impose such a duty through the back door of the DCCPPA's anti-fraud provisions, even though doing so would contravene the plain language of the federal and District statutes and regulations and upset the settled expectations of restaurants and food suppliers in the District.

The implications of the duty proposed by plaintiff would be momentous: everyone who ever ate a meal that contained trans fat and who was not informed of the trans fat content of the meal at the point of sale could sue the provider of that food. Since virtually no District restaurants and, prior to January 1, 2006, few purveyors of packaged food made such disclosures, this would threaten to unleash a wave of liability that would overwhelm thousands of restaurants, chains, bakeries and other food sellers. The same theory also would support claims against any food seller or restaurateur who did not notify his or her customers that particular foods contained saturated fat, cholesterol or any other nutrient or ingredient that is associated with potential health risks, if at all, only when consumed in excess. There is no legal or common sense justification for opening the door to such an avalanche of potential claims.

Even if KFC had a duty to disclose the trans fat content of its food, plaintiff's implied warranty and DCCPPA claims still would fail for multiple additional reasons. First, as to implied warranty, plaintiff asserts that the menu items he purchased were not merchantable, yet he does not identify those menu items or even the types of food that he bought. No one can state a claim that a product was non-merchantable without even bothering to identify the product. Second, the standard for merchantability is merely that the product be ordinary and meet the reasonable expectations of a typical consumer. Here, nothing in the Complaint indicates that the menu items purchased by plaintiff failed to meet this low threshold, or that trans fat is uniquely present in those items. Third, plaintiff does not plead any legally cognizable injury: by his own

account, he experienced no immediate ill effects and, even now, expressly disclaims any personal injury whatsoever.

Plaintiff's DCCPPA claim also is subject to dismissal on several additional grounds. First, in order to have standing to pursue a claim under the DCCPPA, a plaintiff must plead an injury-in-fact. Here, plaintiff has not pled any actual injury and instead claims that KFC violated a purported right of consumers in the District to receive information about trans fat content in restaurant food. Under District case law, mere allegations of the violation of an abstract right to receive information are insufficient to confer standing to sue. Equally importantly, in order to state a claim under the DCCPPA, plaintiff must allege that KFC's non-disclosure would tend to mislead the ordinary consumer into believing that its food contained little or no trans fat. However, plaintiff cannot plausibly make such an allegation: he was buying fast food at a time when not even suppliers of packaged food, let alone restaurants, were required to identify the trans fat content of their food. In such circumstances, no inference whatsoever as to the trans fat content of KFC food can be drawn from a mere non-disclosure.

Perhaps recognizing the problems with his non-disclosure allegations, plaintiff also seeks to plead a negligent misrepresentation claim. But this claim, which is predicated on KFC's statements that it provides the "best food" and that KFC food may be consumed as part of a healthy lifestyle, fares no better than the others. First, plaintiff has not pled this claim with the particularity required by Rule 9(b). The Complaint does not identify when the alleged misrepresentations were made, where, by whom, and by what means of communication. It provides no context whatsoever for the statements, and in the case of the "healthy lifestyle" statement, not even a direct quotation. Second, even if properly pled, this claim would be subject to dismissal because neither statement remotely approaches the actionable. The "best food"

statement is mere sales puffery that, as a matter of black-letter law, cannot give rise to a claim. The "healthy lifestyle" assertion, particularly at the level of generality pled in the Complaint, is merely a true statement consistent with standard dietary guidelines.

For these reasons, KFC respectfully requests that the Court reject CSPI's attempt to impose through litigation its own ideal standards for the preparation and sale of food, and dismiss the Complaint.

## BACKGROUND

Partially hydrogenated vegetable oil, which is used by a vast array of food suppliers and restaurateurs in the preparation of hundreds of different packaged and prepared foods, has drawn the ire of CSPI because it contains trans fat. Trans fat "is a specific type of fat formed when liquid oils are made into solid fats," although "a small amount of trans fat is found naturally, primarily in some animal-based foods." FDA Trans Fat Q&A (Ex. 4) at 3. It is common knowledge that consumption of excessively high levels of fat over an extended period of time has been associated with certain increased health risks. See, e.g., IOM Report (Ex. 6) at 14; 2005 Dietary Guidelines, Ch. 6 (Ex. 1) at 29. The FDA considers saturated fat and trans fat to be similar in this regard: "Trans fat behaves like saturated fat by raising low-density lipoprotein (LDL or 'bad') cholesterol that increases your risk of coronary heart disease (CHD)." FDA Trans Fat Q&A (Ex. 4) at 3. The FDA therefore recommends keeping "consumption of both saturated and trans fats and cholesterol low while consuming a nutritionally adequate diet." Id. at 5. However, the FDA also recognizes that the average American consumes far less trans fat than saturated fat. Id. at 4; Food Labeling: Trans Fatty Acids in Nutrition Labeling, Nutrient Content Claims, and Health Claims, 68 Fed. Reg. 41434, 41483 (Jul. 11, 2003) (to be codified at

21 C.F.R. pt. 101) ("FDA Final Rule") ("FDA agrees . . . that the average saturated fat intake in the United States is about 5 times greater than the average trans fat intake.").

Hundreds of different foods contain trans fats. According to the U.S. Department of Health and Human Services, major sources of trans fats include: cakes, cookies, crackers, pies and bread (40% of total trans fats consumed); animal products (21%); margarine (17%); fried potatoes (8%); potato chips, corn chips and popcorn (5%); household shortening (4%); and other sources including breakfast cereal and candy (5%). See 2005 Dietary Guidelines, Ch. 6 (Ex. 1) at Table 11. The National Academy of Sciences also recognizes that trans fat is present in different sources containing "traditional stick margarine . . . and vegetable shortenings . . . that have been subjected to hydrogenation," milk, butter and meats. IOM Report (Ex. 6) at 4.

Like "countless" other restaurants and food suppliers,[2] KFC uses partially hydrogenated vegetable oil in the preparation of some of its food, and therefore some, but not all, menu items sold at KFC contain trans fat. See Complaint ¶ 18; KFC, Ingredient Statement, available at http://www.kfc.com/kitchen/nutrition.htm ("KFC Ingredient List") (Ex. 11). KFC voluntarily provides its customers with access to detailed nutritional information, including the trans fat content of its menu items. It makes that information available in two principal ways. First, brochures available to customers in restaurants include a "Nutrition Guide" that specifies nutritional content of KFC's menu items. See KFC, Keep it Balanced, Form #6020 ("KFC Brochure") (Ex. 12). Second, the KFC website includes the same Nutrition Guide – which has identified the trans fat content of menu items since December 2004, more than a year before

---

2 CSPI itself recognizes that "McDonald's, Burger King, Wendy's, KFC, Dunkin' Donuts, Applebee's, Red Lobster, and countless other chains" use partially hydrogenated vegetable oil. 2004 CSPI Press Release (Ex. 9) (emphasis added).

even suppliers of packaged foods were required to disclose trans fat content. See KFC, Nutrition Guide, available at http://www.kfc.com/kitchen/nutrition.htm ("KFC Nutrition Guide") (Ex. 13). Additionally, since August 2005, the website has included an "Ingredient List" that provides the ingredients of menu items, including whether items contain partially hydrogenated vegetable oil. See KFC Ingredient List.

Despite the widespread knowledge that many types of fast food often contain high levels of fat and KFC's voluntary efforts to make nutritional information available to its customers, plaintiff claims to have been unaware that some KFC products contain trans fat. Complaint ¶ 31. On an unspecified number of occasions in 2004 and 2005, plaintiff allegedly purchased food at the KFC restaurant at Florida Avenue and North Capitol Street in Washington, D.C., and at other KFC locations in the city, although he never specifies what food he purchased. Complaint ¶ 30. Ironically, the "misrepresentations" on which plaintiff allegedly relied appear to be selectively-edited paraphrases of statements that appear on the very same KFC website that provides consumers with detailed information that includes the nutritional content and ingredients of its menu items. See KFC Website (Ex. 10). Plaintiff disclaims any ill effects or personal injury as a result of his consumption of food from KFC. Complaint ¶ 47.

## ARGUMENT

In reviewing this motion to dismiss, the Court must assume that plaintiff's factual allegations are true, but may not accept "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint" or "legal conclusions cast in the form of factual allegations." Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). "Dismissal under Rule 12(b)(6) is proper when, taking the material allegations of the complaint as admitted, . . . and construing them in plaintiff's favor, . . . the court finds that the

plaintiff has failed to allege all the material elements of his cause of action." Weyrich v. The New Republic, Inc., 235 F.3d 617, 623 (D.C. Cir. 2001) (internal citations omitted).

I. Plaintiff's Implied Warranty And DCCPPA Claims Should Be Dismissed Because KFC Had No Duty To Affirmatively Disclose Any Ingredients, Much Less Trans Fat Content.

Plaintiff's claims that KFC breached its implied warranty of merchantability and violated the D.C. Consumer Protection Procedures Act are based on the same underlying theory – that KFC should have affirmatively informed plaintiff, at the point of purchase, of the trans fat content of the items that he bought. Both therefore fail to state a claim because KFC had no legal duty to make such disclosure. "The question . . . whether a defendant owes a duty to the plaintiff under a particular set of circumstances is entirely a question of law that must be determined only by the court." Settles v. Redstone Dev. Corp., 797 A.2d 692, 695 (D.C. 2002) (quoting Croce v. Hall, 657 A.2d 307, 310 (D.C. 1995)). Nothing in the common law of implied warranty, nor in the DCCPPA, required KFC to disclose the trans fat content of the food purchased by plaintiff. To the contrary, both federal and District statutes and regulations expressly exempted KFC from any obligation to provide such information.

A. The Law Of Implied Warranty Imposed No Duty To Disclose.

Plaintiff claims that KFC's alleged non-disclosure of the trans fat content of its food breached the implied warranty of merchantability. Yet diligent research has revealed not a single case in the District or elsewhere in which a court has recognized a common-law duty on restaurateurs or food suppliers to disclose ingredients or nutrients that do not cause any immediate harm but pose a potential health risk, if at all, only if consumed in significant quantities over an extended period of time. The case law limits a food supplier's disclosure obligation to situations involving known allergens or toxins, which present an immediate danger

of acute harm. See, e.g., Edwards v. Hop Sin, Inc., 140 S.W.3d 13 (Ky. Ct. App. 2003) (finding issue of fact whether restaurant had duty to warn customer of bacterium found in raw oysters where customer suffered immediate serious illness); Livingston v. Marie Callenders, Inc., 72 Cal. App. 4th 830 (Cal. Ct. App. 1999) (finding issue of fact whether restaurant should have warned of MSG in soup, where plaintiff suffered "respiratory arrest, hypoxia, cardiac arrest, and brain damage"); Brown v. McDonald's Corp., 101 Ohio App. 3d 294 (Ohio Ct. App. 1995) (finding issue of fact whether defendant should have warned of presence of seaweed-derived ingredient in hamburger, where allergic reaction to ingredient required immediate hospitalization).

This absence of case law recognizing the duty proposed by plaintiff makes sense in light of a fundamental principle of tort law: there is no duty to warn of risks that are commonly known, such as the potential health risks associated with excessive consumption of fat. According to the Restatement (Second) of Torts:

> Many products cannot possibly be made entirely safe for all consumption, and any food or drug necessarily involves some risk of harm, if only from over-consumption. . . . Good butter is not unreasonably dangerous merely because, if such be the case, it deposits cholesterol in the arteries and leads to heart attacks; but bad butter, contaminated with poisonous fish oil, is unreasonably dangerous.
>
> [A] seller is not required to warn with respect to products, or ingredients in them, which are only dangerous, or potentially so, when consumed in excessive quantity, or over a long period of time, when the danger, or potentiality of danger, is generally known and recognized.

Restatement (Second) of Torts, §402A, Comments i & j. Just as there is no requirement that a grocer selling "good butter" warn his customers that it contains cholesterol and increases one's risk of heart disease if consumed in excess, there is no requirement that restaurateurs warn their

customers of common ingredients or nutrients, such as cooking oils, that present no immediate danger (unlike allergens or toxins) but may increase health risks, if at all, only when consumed frequently and excessively.

Courts have applied the principles set forth in the Restatement to a variety of circumstances, including the sale of fast food, and declined to impose a duty to warn of the commonly known risks of excessive consumption. In Pelman v. McDonald's Corp., 237 F. Supp. 2d 512, 532 (S.D.N.Y. 2003),[3] a New York federal court rejected the plaintiffs' effort to force McDonald's to warn of health risks associated with over-consumption of fast food, reasoning that "[i]t is well-known that fast food in general . . . contain[s] high levels of cholesterol, fat, salt, and sugar, and that such attributes are bad for one."[4] See also, e.g., Desatnik v. Lem Motlow, Prop., Inc., 1986 Ohio App. LEXIS 5240, No. 84 C.A. 104, at *6-7 (Oh. Ct. of App. Jan. 9, 1986) (citing Restatement (Second) of Torts, §402A, Comment j);

---

3 Following this decision granting the defendants' motion to dismiss, the plaintiffs in Pelman filed an amended complaint. On grounds that do not affect the validity of the cited decision, the Second Circuit Court of Appeals later affirmed in part and reversed in part the district court's subsequent decision dismissing the amended complaint, 2003 WL 22052778 (S.D.N.Y. Sept. 3, 2003), aff'd in part, vacated in part, 396 F.3d 508 (2nd Cir. 2005).

4 This Court may take judicial notice, as the Pelman court did, of facts that are commonly known, such as the fact that many types of fast food may contain high levels of fat. See Fed. R. Evid. 201(a) ("A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."); 31A C.J.S. Evidence § 10 (2006) ("Courts may properly take judicial notice of facts that may be regarded as forming part of the common knowledge of every person of ordinary understanding and intelligence."); 29 Am. Jur. 2d Evidence § 33 (2006) ("The law has long afforded judicial notice to a fact if it was a matter of common and general knowledge . . . ."); Washington Post v. Robinson, 935 F.2d 282, 291 (D.C. Cir. 1991) (taking judicial notice of existence of newspaper articles in D.C. area that publicized ongoing criminal investigation); In re Olson, 884 F.2d 1415, 1424 n.14 (D.C. Cir. 1989) (taking judicial notice that attorney's billing rate was reasonable).

Morris v. Adolph Coors Co., 735 S.W.2d 578 (Tex. Ct. App. 1987) (no duty to disclose when selling untainted beer, where over-consumption of the same product may impair judgment and motor skills).

There is good reason for the reluctance of tort law to intervene in this area. Decisions about what foods to eat and in what quantities are matters of consumer choice and individual responsibility. The average American eats approximately 1,000 meals each year, taking in nearly 70% of his or her calories from foods prepared at home, see FDA 6/2/06 Statement (Ex. 5), and consumes scores, if not hundreds, of different types of food. Americans have a wide variety of sources of information available as to proper nutrition and diet, through newspapers, magazines, books, television and the internet. There is no need for tort law to interpose a duty to warn where ingredients or nutrients contained in particular foods consumed at particular meals pose a risk of harm, if at all, only if consumed in excessive quantities over an extended period of time – especially if the health risks of the ingredient or nutrient are widely known. Tort law wisely reserves the remedy of a lawsuit for money damages for situations where the ingredient or nutrient poses a risk of immediate harm and results in actual physical injury.

B. The DCCPPA Imposed No Duty To Disclose.

As the basis for his assertion that KFC violated the DCCPPA by not disclosing the trans fat content of its food, plaintiff relies on Section 28-3904(f) of the Act, which prohibits the "fail[ure] to state a material fact if such failure tends to mislead." D.C. Code § 28-3904(f) (2006). But this general clause cannot be construed to impose a duty on restaurants to disclose ingredients or nutrients of food that they serve, or, on KFC, to disclose the use of partially hydrogenated oils.

First, it would be inconsistent with the history and purpose of the DCCPPA to read into it a general duty on restaurants to disclose ingredients or nutrients. The statute was intended "to protect local consumers from improper and fraudulent trade practices," Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 174 (D.D.C. 2003), and to "deter potentially fraudulent conduct," Wells v. Allstate Insurance Co., No. 00-0760, 2006 U.S. Dist. LEXIS 4694, at *18 (D.D.C. Jan. 24, 2006), not as a vehicle for plaintiffs to test new theories of liability and advance their public policy goals.

Second, plaintiff's interpretation of the DCCPPA would place it in flat contradiction of both federal and District statutes and regulations specifically governing the nutritional labeling of restaurant food. Like the common law, the federal laws and regulations that govern the production, labeling and sale of food do not require restaurants to disclose trans fat content or any other nutrient content. Restaurants are expressly exempted from the nutrition labeling requirements of the Nutrition Labeling and Education Act of 1990 ("NLEA"). 21 U.S.C. § 343(q)(5)(A)(i) ([These requirements shall not apply to food] "which is served in restaurants or other establishments in which food served for immediate human consumption or which is sold for sale or use in such establishments."); see also Public Citizen, Inc. v. Shalala, 932 F. Supp. 13, 15 (D.D.C. 1996) ("Restaurants are completely exempt from [the general nutrition labeling] standards and requirements."). Even suppliers of packaged foods were not required to identify the trans fat content of their products until new FDA regulations went into effect on January 1, 2006, after the dates of plaintiff's purchases. 21 C.F.R. § 101.9(c)(2)(ii); FDA Final Rule, 68 Fed. Reg. 41434.[5] Under the new FDA trans fat regulations, restaurants are not required to

[5] As shown in Part IV(C), infra, plaintiff's request for prospective injunctive relief is preempted by the new FDA trans fat disclosure regulations.

disclose the trans fat content of their food unless the labeling, if any, contains a specific claim regarding the health or nutrient content of the food. See 21 C.F.R. § 101.10 (2006) ("Nutrition labeling [as mandated by these regulations] shall be provided upon request for any restaurant food or meal for which a nutrient content claim . . . or a health claim . . . is made . . . ."); FDA Final Rule, 68 Fed. Reg. at 41473 ("Restaurant food is not subject to mandatory nutrition labeling requirements, unless a nutrition-related claim is made.").

The D.C. Council has largely adopted the federal standards for food labeling and incorporated them into D.C. law. Nothing in these standards imposes a duty on restaurateurs to notify consumers of the ingredients or nutrient content of their food. To the contrary, the D.C. Municipal Regulations governing food labeling requirements limit their scope to "packaged" food (defined expressly to exclude "a wrapper, carry-out box, or other nondurable container used to containerize food . . . during service and receipt of the food by the consumer") and bulk food, and expressly adopt the exemptions (including those for restaurants) that are part of the NLEA. D.C. Mun. Regs. title 25, §§ 1102, 9901 (2006). Furthermore, the D.C. Council twice recently considered but chose not to enact legislation that would impose a duty on D.C. restaurateurs to provide nutritional information. See Menu Education and Labeling Act of 2005, B16-495, D.C. Council (2005) (bill that would require D.C. chain restaurants to provide all "nutritional information" including calories and trans fat content); Nutritional Information at Restaurants Act of 2003, B15-387, D.C. Council (2003) (same).

To construe the DCCPPA to impose the duty proposed by plaintiffs would upset the settled expectations of all restaurants and other dining establishments in the District and impose draconian consequences. Under plaintiff's theory, restaurants like KFC would face a potential penalty of $1500 per violation, plus the possibility of punitive damages, attorney's fees and

injunctive relief. See D.C. Code § 28-3905(k)(1) (2006). Plaintiff undoubtedly would advocate an expansive interpretation of the DCCPPA and argue that each putative class member should receive $1500 for each and every instance in which he or she bought food containing trans fat at a KFC restaurant in the District within the limitations period. Yet before the trans fat labeling regulations went into effect on January 1, 2006, virtually no restaurants and few purveyors of packaged food were disclosing information about trans fat content. Were they all guilty of actionable fraud under the DCCPPA, punishable by perhaps as much as $1500 per purchase? If so, the D.C. Municipal Regulations on which those restaurants and food suppliers relied constitute an extraordinary trap for the unwary.

In these circumstances, the more general law – the DCCPPA's "material fact" provision – must yield to the specific laws governing food labeling, and plaintiff's effort to impose a duty in the face of clear federal and District law to the contrary should be rejected. See N. Am. Catholic Edu. Programming Found., Inc., v. F.C.C., 437 F.3d 1206, 1209 (D.C. Cir. 2006) ("It is a commonplace of statutory construction that the specific governs the general.") (citing Morales v. Trans World Airlines, Inc., 504 U.S. 374, 384 (1992)); Rodriguez v. P.R. Fed. Affairs Admin., 435 F.3d 378, 382-83 (D.C. Cir. 2006) ("[T]he canons of statutory construction require that the specific govern the general.").

Moreover, KFC voluntarily undertook to provide nutrient and ingredient information in a manner that is responsive to the interests of its customers who might inquire about or seek this information. Plaintiff does not allege, nor is it the case, that where such information was provided that it was done in a deceptive manner. Rather, KFC undertook to furnish information that would enable an interested consumer to understand the nutritional characteristics of its menu

items and to judge for themselves how such foods fit within their overall, individual dietary objectives.

Plaintiff's novel theory of liability reaches far beyond the circumstances of this case: an individual who purchases and consumes food that may pose an increased health risk (if at all) only if consumed in excess over a long period, who suffers no ill effects, but who subsequently has second thoughts about his or her purchases, would be able to sue to enjoin the sale of that food or force the seller to provide information beyond what any federal or state law or regulation requires. Anyone could pursue a claim against any restaurant or food supplier from whom he or she ever bought a meal or snack containing trans fat – from French fries at the local diner to popcorn at the movie theater or Maryland crab cakes at a waterfront restaurant. Nothing would prevent this plaintiff or anyone else from bringing virtually identical claims with regard to any ingredient or nutrient associated with potential health risks when consumed in excess.[6] The determination of whether it should be permissible to sell food containing trans fat, saturated fat or any other such nutrient or ingredient, and the determination of what information the seller must provide about such nutrients or ingredients, are matters of public policy for legislative or regulatory resolution, not for case-by-case application of unprecedented and unbounded theories of liability.

---

6 Food containing saturated fat, which is extremely common in the American diet, would be an obvious target for CSPI's next attempt at regulation-by-litigation, particularly given that CSPI considers consumption of saturated fat to be a major health risk and recognizes that the average American consumes far more saturated fat than trans fat. See CSPI Petition (Ex. 6) at 15 n.71 ("it is also important to address saturated fat, a major dietary contributor to heart disease"; the amount of calories from saturated fat in the average American adult diet is "several-fold more" than the amount of calories from trans fat).

II. Plaintiff's Negligent Misrepresentation Claim Fails Either To Satisfy The Pleading Requirements Of Rule 9(b) Or To State A Claim Under Rule 12(b)(6).

Plaintiff's claim of negligent misrepresentation – that "KFC, knowing that its food products contained trans fats, represented to Dr. Hoyte and D.C. Consumers that it was providing the 'best food' and that its food could be consumed as part of a healthy lifestyle," Complaint ¶ 57 – should be dismissed for at least two reasons. First, plaintiff has not pled this claim with the particularity required by Rule 9(b). Second, even assuming this claim was properly pled, plaintiff has failed to state a cognizable cause of action: the "best food" statement is a textbook example of non-actionable puffery, while the "part of a healthy lifestyle" statement is merely a true statement consistent with the federal government's own standard dietary advice.

A. The Negligent Misrepresentation Claim Lacks The Requisite Particularity.

"To establish negligent misrepresentation by a defendant, a plaintiff must show that: 1. [t]he defendant negligently communicated false information[;] 2. [t]he defendant intended or should have recognized that the plaintiff would likely be imperiled by action taken in reliance upon his misrepresentation [and] 3. [t]he plaintiff reasonably relied upon the false information to his detriment." Hall v. Ford Enterprises, Ltd., 445 A.2d 610, 612 (D.C. 1982). Under Rule 9(b), a claim of negligent misrepresentation must be pled with particularity. See, e.g., Anderson v. USAA Casualty Ins. Co., 221 F.R.D. 250, 254 (D.D.C. 2004) ("[A] failure to satisfy the pleading requirements of Rule 9(b) would be fatal to the plaintiff's claim of negligent misrepresentation."). In order to meet the strict pleading requirements of Rule 9(b), a plaintiff must specify the "circumstances" of the alleged misrepresentation – the "who, what, when, where, and how." Id. at 253; see also In re U.S. Office Products Co. Sec. Litig., 251 F. Supp. 2d 58, 74 & n.9 (D.D.C. 2003) (holding that plaintiff "must adequately allege all of the required elements, including allegations that the plaintiff reasonably relied on the alleged

misrepresentation" and recognizing that "[s]imilar to the requirements for pleading fraud claims, failure to meet the pleading requirements of Rule 9(b) may also be fatal to plaintiffs' claims of negligent misrepresentation") (emphasis in original).

Plaintiff's allegations of negligent misrepresentation are utterly devoid of the requisite particularity. With regard to each of the alleged misrepresentations – the "best food" statement and the "part of a healthy lifestyle" statement – plaintiff fails to identify who made the statement, when, to whom, by what means of communication, where or in what context. The "healthy lifestyle" representation does not even purport to be a direct quotation. The Complaint also fails to allege that plaintiff ever read the alleged statements, let alone relied upon them in making his purchases, other than by the purely conclusory phrase, "Dr. Hoyte and D.C. Consumers reasonably relied on KFC's representations." Complaint ¶ 58. Plaintiff, an experienced medical doctor, must do more than offer these conclusory allegations to adequately plead that these generalized statements guided his nutritional and dietary decisions or led him to believe that fried chicken was trans-fat-free. Plaintiff's failure to meet the minimum threshold for pleading a claim of negligent misrepresentation requires that the claim be dismissed.

B. <u>Plaintiffs' Allegations Of Misrepresentation Fail To State A Claim</u>.

Even assuming that plaintiffs' allegations of negligent misrepresentation are properly pled, they do not state a claim under Rule 12(b)(6). As best can be determined, given the lack of particularity in the Complaint, the first alleged misrepresentation – KFC's assertion that it provides the "best food" – is taken (out of context) from the opening sentence of KFC's main nutritional page on its website: "At KFC, we take great pride and care to provide you with the

best food and dining experience in the quick service restaurant business."[7] KFC Website (Ex. 10). The other alleged misrepresentation – that KFC food could be consumed as part of a healthy lifestyle – also appears to refer to a statement on KFC's website: "We believe eating sensibly, combined with appropriate exercise, is the best solution for a healthy lifestyle." Id. As shown below, neither statement comes close to constituting an actionable misrepresentation.

More fundamentally, however, plaintiff's apparent reliance on statements from KFC's website exposes a crippling internal contradiction in his case: the same website that contains the alleged misrepresentations also contains an Ingredient List that lists the ingredients of KFC's menu items, identifying those menu items that are prepared with partially hydrogenated vegetable oil – the very information that plaintiff claims KFC failed to disclose to him. See KFC Ingredient List (Ex. 11). The website also includes a Nutrition Guide that identifies the number of calories and level of various nutrients in KFC's menu items, and that has identified trans fat content since December 2004, more than a year before even suppliers of packaged food were required to disclose trans fat content. See KFC Nutrition Guide (Ex. 13). For example, the KFC Nutrition Guide informs consumers that an order of three Crispy Strips contains 4.5 grams of trans fat, while a Honey BBQ Sandwich contains 0.5 grams. Accordingly, if plaintiff read and relied upon KFC's website for its statements about "best food" and "healthy lifestyle," he cannot claim that KFC hid from him the very information that KFC presented on that same website. See I. Meyer Pincus & Assoc., P.C. v. Oppenheimer & Co., Inc., 936 F.2d 759, 762 (2d Cir. 1991) (no claim for material misrepresentation where the document containing the alleged misrepresentation also "states exactly the 'fact' that [plaintiff] contends has been covered up.");

---

7 The Complaint selectively omits the last clause of this sentence, which qualifies the "best food" statement and limits it to the appropriate context: fast food.

In re Telecom Ltd. Securities Litig., No. 93 Civ. 4384, 1994 U.S. Dist. LEXIS 11730, at *15 (S.D.N.Y. Aug. 22, 1994) ("[S]tatements challenged in the complaint must be viewed in context."). On the other hand, if plaintiff did not read the statements on KFC's website, he cannot allege that he relied upon those statements, a necessary element of his negligent misrepresentation claim. See Hall, 445 A.2d at 612. Either way, the negligent misrepresentation count must be dismissed.

1. The Assertion That KFC Provides The "Best Food" Is Non-Actionable Puffery.

Claiming to provide the "best food," as KFC allegedly did, is a classic example of sales or marketing hype known as "puffing" or "puffery." "[M]isrepresentation must be distinguished from mere 'puffing,' such as a statement of the supposed superiority of the product . . . . 'Puffing' refers to loose general statements made by sellers in commending their products . . . that amount to no more than an expression of the seller's opinion about the character or quality of the product." Am. Law of Products Liability 3d, § 26:13 (2006); see also Black's Law Dictionary, 8th ed. (2004) (defining "puffing" as "expressing opinions, not asserting something as fact"). A marketer is not required to substantiate a statement of puffery precisely because it is an subjective statement of opinion. Only an objective statement of fact that is capable of being proven as true or false constitutes an affirmative representation that a consumer can be fairly deemed to have relied upon. See, e.g., American Italian Pasta Co. v. New World Pasta Co., 371 F.3d 387, 390-91 (8th Cir. 2004).

It is well-established in the law that puffery, including a claim that one's product is "the best" or "of the highest quality," is not actionable. See, e.g., All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862, 868 (7th Cir. 1999) (statement that product was "the best"); Midwest Printing, Inc. v. AM Int'l, Inc., 108 F.3d 168, 171 (8th Cir. 1997) (representations concerning

comparative quality of products); Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995) (claim of "thorough" research); Cook, Perkiss & Liehe, Inc. v. Northern California Collection Serv., 911 F.2d 242, 246 (9th Cir. 1990) (claim to be the "low cost . . . experts"); Williams v. Gerber Products Co., No. 05 Civ. 1278, 2006 U.S. Dist. LEXIS 52594, at *6 (S.D. Cal. May 24, 2006) ("[N]o reasonable consumer relies on puffery."). Cf. D.C. Code § 28:2-313 (2006) ("[A]n affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.") (emphasis added).

Indeed, a federal court in New Hampshire recently concluded that language identical to the statement allegedly made by KFC constitutes non-actionable puffery: after considering whether Taco Bell had deceived its customers by claiming to provide "the best food and dining experience in the quick service restaurant business," the court found that "[s]uch general claims to superiority, known as 'puffery,' do not amount to actionable representations." Evans v. Taco Bell Corp., No. 04-CV-103, 2005 WL 2333841, at *12 n.19 (D.N.H. Sept. 23, 2005). As a matter of law, the assertion by KFC that it provides the "best food" cannot constitute a negligent misrepresentation.

2. The Assertion That KFC Food Products Can Be Consumed As Part Of A Healthy Lifestyle Is Not An Actionable Misrepresentation.

The "part of a healthy lifestyle" statement allegedly made by KFC comes nowhere near meeting the standards for actionable misrepresentation. The statement on which plaintiff's vague allegations seem to be based – "We believe eating sensibly, combined with appropriate exercise, is the best solution for a healthy lifestyle," KFC Website (Ex. 10) – never even refers to KFC food and simply states a widely-acknowledged truth in extremely general terms. The statement is nearly identical to health advice given by the federal government, which recommends that Americans "[c]hoose a lifestyle that combines sensible eating with regular

physical activity" and "[t]ak[e] small steps to eat a more balanced diet and to stay physically active." HHS Aim For Fitness Statement (Ex. 2) and HHS 3/12/04 Statement (Ex. 3), respectively; cf. Pelman, 237 F. Supp. 2d at 528 (when McDonald's encourages its customers to eat its products "everyday," such a statement "is mere puffery, at most, in the absence of a claim that to do so will result in a specific effect on health") (emphasis added).

Even if plaintiff intends to refer to some other statement that food from KFC may be consumed as part of a healthy lifestyle, such a statement cannot be considered a misrepresentation. Plaintiff does not allege that KFC said anything about the health effects of any particular level of consumption, only that KFC said that its food "could" be consumed as "part" of a healthy lifestyle. Complaint ¶ 57. Whether a particular lifestyle is healthy obviously depends on a multitude of factors, including myriad aspects of one's diet and routine. CSPI itself takes the position that the association between consumption of trans fat and health risks varies depending on the level of consumption. In its petition to ban partially hydrogenated vegetable oil, CSPI cites research showing a "positive linear trend" between trans fat intake and risk of heart disease, and relies upon studies involving repeated consumption of trans fat over substantial periods of time. See CSPI Petition (Ex. 8) at 14. Ingestion of food from KFC in moderation is not inconsistent with a healthy lifestyle, just as ingestion, in moderation, of other food items that contain saturated fat or trans fat – e.g., a bag of potato chips, an order of McDonald's French fries or a bowl of ice cream – is not inconsistent with a healthy lifestyle. Plaintiff's allegations therefore cannot support a claim of negligent misrepresentation.

## III. Plaintiff's Implied Warranty Claim Should Be Dismissed For Multiple Additional Reasons.

As shown above, plaintiff's claim that KFC breached the implied warranty of merchantability should be dismissed for the fundamental reason that KFC had no duty to disclose

the trans fat content of its food. Even if KFC had such a duty, though, plaintiff's implied warranty claim fails for three additional reasons. First, plaintiff does not identify the particular menu items or even the general type of food that he allegedly purchased, a prerequisite to any claim that those products were not merchantable. Second, the factual allegations of the Complaint do not support plaintiff's conclusory assertion that the food was non-merchantable; plaintiff does not allege that the food that he purchased was in any way different from food sold by other KFC restaurants, and he acknowledges that the very characteristic that he claims made his order non-merchantable – its trans fat content – is a characteristic common to food sold by KFC and other food suppliers throughout the country. Complaint ¶¶ 18-24. Third, and quite importantly, plaintiff does not claim to have suffered any legally cognizable damages as a result of KFC's alleged breach of warranty.

A. Plaintiff Fails To Identify The Food That He Purchased.

Nowhere in the Complaint does plaintiff identify the particular menu items or even the general types of food that he allegedly bought from KFC. His factual allegations on this point are limited to the assertion that he "purchased KFC products." Complaint ¶¶ 39, 30-31. From this description, there is no way to know whether plaintiff purchased several buckets of fried chicken or merely a few salads. Plaintiff could have ordered any number of items from KFC's long menu, but one cannot tell from the Complaint what purchases he actually chose to make.

As a threshold matter, it cannot be the case that plaintiff can proceed with his claim that particular goods were non-merchantable without identifying those goods. The Complaint's deficiencies in this respect are particularly acute because not all menu items served at KFC restaurants contain trans fat. See KFC Brochure (Ex. 12); KFC Nutrition Guide (Ex. 13). On plaintiff's implied warranty claim, where a central issue is the conformity of the goods purchased

by the plaintiff with typical goods of their kind, it is material whether plaintiff purchased corn on the cob (which contains no trans fat) or a three-piece Extra Crispy chicken dinner (which does contain trans fat). However, there is no way to tell from the Complaint which menu items plaintiff purchased and therefore no starting point from which to assess his claim for breach of implied warranty.

B. Plaintiff's Allegations Do Not Support His Assertion That Whatever Food He Did Purchase Was Non-Merchantable.

In order to be "merchantable," goods must merely be ordinary. Merchantable goods are those which, when compared to the other goods of their kind available in the marketplace, meet the basic expectations of consumers of those goods. The principal warranty in D.C. Code. § 28:2-314(2) with regard to the sale of food or drink is that the goods are "fit for the ordinary purpose" for which they are used – that is, fit to be consumed. See U.C.C. § 2-314, Comment 5 (adopted by the District of Columbia, see Act of Dec. 30, 1963, 88 Pub. L. No. 243, 77 Stat. 630). Under D.C. law, whether a meal served at a restaurant meets this standard, and in turn whether the restaurant breached the implied warranty of merchantability, is determined based on the "reasonable expectations" of the consumer. A merchant is liable under this standard if it sells food that falls below the level of quality reasonably expected by the ordinary consumer, and that deficiency causes plaintiff injury. Hochberg v. O'Donnell's Restaurant, Inc., 272 A.2d 846, 848 (D.C. 1971); see also Standardized Civil Jury Instructions for the District of Columbia, §23.02[1]. Conversely, there is no breach of warranty where a plaintiff is injured by an ingredient or nutrient that "should reasonably be expected by the consumer to be in the food served to him." Hochberg, 272 A.2d at 848.

Where the food in question meets consumers' reasonable expectations, a plaintiff cannot establish breach of warranty. The law does not require that "goods shall be of first quality or

even that they shall be as good as the average of goods of the sort." Brennan v. Shepherd Park Pharmacy, 138 A.2d 494, 495 (D.C. 1958). Furthermore, there is no barrier to this Court determining, as a matter of law, the reasonable expectations of consumers, particularly where they involve matters within the common knowledge of the general public. See, e.g., Pelman, 237 F. Supp. 2d at 532 (dismissing complaint and holding that it is well-known that fast food contains high levels of cholesterol, fat, salt and sugar).

Here, plaintiff pleads no facts indicating that the unidentified food he purchased fell short of the reasonable and ordinary expectations of consumers. Plaintiff summarily alleges that "the food products purchased by Dr. Hoyte and D.C. Consumers were not (1) of at least fair, average quality, (2) fit for human consumption, and (3) adequately labeled to advise Dr. Hoyte and D.C. Consumers that they were consuming dangerous trans fat products and exposing their health to serious injury." Complaint ¶ 40. Such conclusory allegations cannot be accepted or considered by the Court for purposes of a motion to dismiss. See, e.g., Major v. Plumbers Local Union No. 5, 370 F. Supp. 2d 118, 123 (D.D.C. 2005). Stripped of these assertions, the Complaint presents no facts suggesting that the food purchased by plaintiff at KFC did not conform to a customer's reasonable expectations regarding fast food. Plaintiff alleges that he ordered food from restaurants owned and operated by KFC, a well-established and widely-known restaurant chain with standardized products. Noticeably absent from the Complaint, however, is any allegation that the food he purchased was different from KFC food for sale throughout the country. Nor does plaintiff allege that the food failed to meet or exceed the typical standard of food sold at fast food restaurants more generally.

Plaintiff also does not allege that trans fat is uniquely present in the foods that he purchased. He relies on documents, including publications of the Department of Health and

Human Services and the National Academy of Sciences, that show that trans fat is present in a multitude of food products and occurs naturally in meat and dairy products. In this respect, the Complaint confirms, rather than refutes, the proposition that consumers reasonably expect that food they order from KFC and other fast food restaurants may contain trans fat. As Pelman recognized, also in the context of a motion to dismiss, "[i]t is well-known that fast food in general . . . contain[s] high levels of cholesterol, fat, salt, and sugar . . . ." 237 F. Supp. 2d at 532.

Rather than state a claim that the food he purchased did not meet the standard of merchantability imposed by law, plaintiff effectively asserts that the food he willingly purchased and consumed did not meet CSPI's idealized standard, which CSPI now seeks to impose on the American food supply through litigation. In doing so, plaintiff seeks to employ the doctrine of implied warranty to serve regulatory purposes for which it was never intended.

C. Plaintiff Does Not Properly Plead Any Legally Cognizable Injury.

Plaintiff also neglects to properly plead, as required by D.C. law, that he suffered any legally cognizable injury as a result of consuming the food that he purchased at KFC. See Payne v. Soft Sheen Products, Inc., 486 A.2d 712, 720 (D.C. 1985); see also Harrison v. Canada Dry Corp., 245 A.2d 642, 643 (D.C. 1968) (recognizing that injury is a necessary element of implied warranty claim and upholding directed verdict against plaintiff who allegedly drank a soda containing cockroaches where "[t]he only reasonable conclusion to be drawn . . . was that he suffered no substantial physical injury"); U.C.C. § 2-314, cmt 13 (adopted by the District of Columbia, see Act of Dec. 30, 1963, 88 Pub. L. No. 243, 77 Stat. 630).

Plaintiff does not allege that the food he ordered was in any way unpalatable or that he suffered any immediate ill effects after he ate his order. So far as appears from the Complaint,

he enjoyed several tasty and satisfying meals from the KFC restaurants he visited. Indeed, by his own account, he liked his purchases enough that he chose to return to the same restaurant and continue dining at KFC restaurants on several occasions. Complaint ¶ 30. Even now, the Complaint expressly disclaims that plaintiff experienced any physical injuries as a result of choosing to frequent KFC restaurants.[8] Complaint ¶ 47. Instead, plaintiff seems to have suffered nothing more than a recent twinge of regret as he thought about the meals that he purchased at KFC many months before, leading him to wish that he had not eaten food containing trans fat. This type of buyer's remorse, unaccompanied by any physical injury or demonstrable economic loss, cannot be legally cognizable. There may be many dietary habits that plaintiff now regrets, but his recourse, as is true for all consumers, is to modify his eating habits and lifestyle choices, not to file a lawsuit.

IV. Plaintiff's Claim Under The DCCPPA Fails For Multiple Additional Reasons.

As explained above, plaintiff's cause of action under the DCCPPA fails for want of any legal duty on the part of KFC. But, even if there were such a duty, this cause of action should be dismissed for at least three additional reasons.[9] First, plaintiff lacks standing: he has not alleged

---

8 While plaintiff seeks unspecified economic damages, he does not claim that he would have been charged less for KFC products if they had not contained trans fat. In fact, plaintiff strongly indicates that KFC food without trans fats would be more expensive. See Complaint ¶ 25 (noting the cost of converting equipment and that "liquid oil may be slightly more costly" while alleging that KFC continues to use partially hydrogenated oil for "economic" reasons). Furthermore, plaintiff received precisely what a reasonable consumer of KFC food would expect to receive, and as a result he is not entitled to recover the purchase price of his meals. Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 176 (D.D.C. 2003) ("Without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs.").

9 Plaintiff also advances an alternate theory of liability that is entirely duplicative of his separate implied warranty claim: he asserts that KFC sold consumer goods "in a condition or manner not consistent with the implied warranty of merchantability provided in D.C. Code

the injury-in-fact required by courts applying the DCCPPA. Second, plaintiff cannot claim, as would be required under the DCCPPA, that KFC's silence regarding the trans fat content of its food "tend[ed] to mislead" him into believing the food was free of trans fat, particularly given that he was buying fast food at a time when food suppliers and restaurateurs were not required to disclose and did not disclose trans fat content, even on packaged food. Third, plaintiff's request for prospective injunctive relief is preempted by federal law.

A. Plaintiff Has Not Alleged Any Injury-In-Fact And Therefore Lacks Standing.

Plaintiff does not allege that he has suffered any injury-in-fact, and without such an allegation his claim under the DCCPPA must be dismissed for lack of standing. Recent decisions in D.C. Superior Court and this district have held squarely that in order to have standing to bring a cause of action under the DCCPPA, a plaintiff must plead an injury-in-fact. See, e.g., Williams v. Purdue Pharma Co., 297 F. Supp. 2d 171, 177 (D.D.C. 2003) (holding that "[t]he amendment to the CPPA in 2000 did not change the requirements for standing under D.C. law" and dismissing complaint for failure to plead injury-in-fact); Hakki v. Zima Co., No. 03-9183, 2006 WL 852126 at *2 (D.C. Super. Ct. 2006) ("Hypothetical injuries cannot confer standing where an actual injury is not alleged in the complaint"; dismissing complaint for plaintiff's failure to "plead an injury in fact to a legally protected interest that is particular to him"); see also Anunziato v. eMachines, Inc., 402 F. Supp. 2d 1133, 1136 (C.D. Cal. 2005) (Under California consumer protection statute, "a plaintiff must now have suffered injury" to have standing.); Fuller Brothers, Inc. v. Int'l Marketing, Inc., 928 F. Supp. 1042, 1045 (D. Or.

§§ 28:2-312-318," and thereby violated the clause of the DCCPPA, D.C. Code § 28-3904(x), that prohibits such conduct. Complaint ¶ 46(b). This theory of liability fails for the reasons set forth in Parts I(A) and III.

1996) ("Some showing of an 'injury in fact' is required to meet the standing requirements for an action in this court.").

Here, plaintiff does not claim to have experienced any personal harm whatsoever – indeed, he expressly disclaims "any personal injury, emotional harm, pain and suffering, or any other form of non-economic damage" and instead seeks to recover for unspecified "economic injuries" stemming from KFC's alleged failure to provide him with information about the trans fat content of its food. Complaint ¶ 47. This is precisely the sort of claim that Judge Collyer dismissed for lack of standing in Williams. The plaintiffs in Williams, 297 F. Supp. 2d at 172, who were prescribed OxyContin for pain but "who personally suffered no ill effects or lack of efficacy," sought to bring a class action under the DCCPPA for economic damages based on the defendants' alleged misrepresentations regarding the drug. Recognizing that standing "requires a showing of actual or threatened injury redressable by the court," id. at 177, the court found that the plaintiffs had not alleged a cognizable injury-in-fact:

> [Plaintiffs] do not allege that OxyContin failed to provide them with effective pain relief or that they suffered any adverse consequences from their use of OxyContin. Defendants argue that, absent such allegations, "it must be assumed that OxyContin worked for plaintiffs and that consequently they got what they paid for." The Court agrees. Without alleging that a product failed to perform as advertised, a plaintiff has received the benefit of his bargain and has no basis to recover purchase costs. . . . The invasion of a purely legal right without harm to the consumer – in this case, to freedom from alleged false and misleading advertising – can be addressed through the administrative process of the Government of the District of Columbia. Should they wish to pursue this matter, plaintiffs should avail themselves of that forum. Without a particularized injury, absent in this case, they do not have standing to proceed in court.

297 F. Supp. 2d at 176, 178 (internal citations omitted); see also Rivera v. Wyeth-Ayerst Laboratories, 283 F.3d 315, 319-20 (5th Cir. 2002) (plaintiff has not alleged "injury in fact"

where she claims that the defendant failed to provide information regarding a drug but does not claim to have suffered any injury herself as a result of the alleged omissions). Similarly, here, plaintiff does not claim that he experienced any adverse consequences from his consumption of KFC food or that KFC failed to provide him with what he paid for. Instead, he asserts that he has a legal right to receive information about the trans fat content of his food, and that KFC violated that right (even though it caused him no actual harm by doing so). As the Williams court correctly concluded, a claim for the alleged violation of an abstract right to receive information cannot proceed in court absent any allegation of injury-in-fact and instead should be addressed through the legislative or administrative process, an arena in which CSPI has substantial experience.

B. KFC's Supposed Omission Did Not "Tend To Mislead" Consumers Into Believing That Its Foods Were Free Of Any Trans Fat Content.

The DCCPPA prohibits any person from "fail[ing] to state a material fact if such failure tends to mislead." D.C. Code § 28-3904(f) (2006). However, it cannot be said that KFC's supposed non-disclosure regarding the trans fat content of its food tended to mislead anyone into believing that the food was free of any trans fat, particularly when (1) many types of fast food are commonly known to be high in fat; and (2) at the time that plaintiff purchased food from KFC – in 2004 and 2005 – food suppliers and restaurateurs were not required to disclose trans fat content, even on packaged food, and it is common knowledge that they generally did not do so. The FDA only introduced a trans fat content labeling requirement for packaged food the year after plaintiff made the last of the purchases on which he bases his claim. Plaintiff does not allege that KFC claimed that its food was free of trans fat, and KFC's alleged non-disclosure cannot be converted into an implicit assurance to consumers that its food was trans fat free. If KFC's alleged non-disclosure "tended to mislead" consumers into believing that its food was

free of trans fat, did the absence of affirmative disclosure by hundreds of other restaurants and food suppliers who also sold products containing trans fat at a time when they were not required to disclose the trans fat content of their products also "tend to mislead"? Rather, when confronted with a food supplier's silence regarding trans fat content at a time when disclosure was not required, any reasonable consumer (and particularly an experienced physician like Dr. Hoyte) would have concluded merely that he or she does not know whether the food contains trans fat.[10]

C. Federal Law Preempts Plaintiff's Claims For Prospective Injunctive Relief.

Plaintiff seeks prospective injunctive relief mandating that KFC provide pre-purchase warnings to all consumers (presumably in the form of food container labels or in-store posters or menu boards) informing them of the use of oils containing trans fats in the preparation of KFC food. Complaint ¶ 51, Prayer for Relief ¶ 7. In effect, plaintiff would require KFC to make mandatory "expressed nutrient content claims" as that term is defined in 21 C.F.R. § 101.13(b)(1) (2006). Any such District requirement, however, would be preempted by federal law, both by the express preemption provision of Section 403A of the NLEA, 21 U.S.C. § 343-1(a)(5), and by the implied conflict preemption principles set forth in Geier v. American Honda Motor Co., 529 U.S. 861, 875, 882-85 (2000).

Restaurant food is expressly exempt from the labeling requirements of the NLEA, 21 U.S.C. §§ 343(q)(5)(A)(i) and (ii), 343(r)(5)(B), with the only exception arising when a restaurant affirmatively makes a claim that characterizes the level of a particular nutrient in a

---

10 If any customer wanted to know whether particular menu items were made with partially hydrogenated vegetable oil, or to obtain other nutritional information, he or she could have found out by accessing the KFC website or asking for a brochure at a KFC restaurant.

food, a so-called nutrient content claim (including as of January 1, 2006 those relating to trans fats). 21 U.S.C. §§ 343(r)(1) and (r)(5)(B); FDA Final Rule, 68 Fed. Reg. at 41465. The FDA has made the policy judgment that, when a restaurant makes nutrient content claims, it should be granted flexibility in determining the methods by which the required nutritional information is communicated to the consumer. 21 C.F.R. § 101.10 directly addresses this situation and provides that when a nutritional content claim is made, the restaurant shall make available to the customer "upon request" nutritional labeling of the type otherwise required only for packaged food, and that such labeling "may be in various forms, including those provided in § 101.45 and other reasonable means." Under 21 C.F.R. § 101.45, a restaurant may communicate the nutritional information by means of in-store brochures of the type utilized by KFC and may supplement this method with website information of the type provided by KFC. Against this regulatory backdrop, any District requirement that nutritional information must be provided to all consumers, even absent request, or must be communicated via a specific means such as menu boards or posters would plainly be preempted.

There are two principal substantive provisions in the NLEA, 21 U.S.C. § 343(q) and 21 U.S.C. § 343(r), each of which has its own corresponding express preemption provision. Section 343(q), which sets forth the general nutritional labeling requirements for packaged food, does not apply to restaurant food. 21 U.S.C. § 343(q)(5)(A)(i) and (ii). Consequently, restaurant food is excluded from the operation of 21 U.S.C. § 343-1(a)(4), which otherwise broadly prohibits "any [state] requirement for nutritional labeling of food that is not identical to the requirement of section [343(q)] . . . ."

In contrast, Section 343(r) contains only a partial exemption for restaurant food. 21 U.S.C. § 343(r)(5)(B). Restaurant food is subject to certain of the requirements of Section

343(r) relating to nutrient content claims. These requirements are implemented by the FDA regulations set forth in 21 C.F.R. §§ 101.10, 101.9 and 101.45. The express preemption provision relating to Section 343(r) is 21 U.S.C. § 343-1(a)(5), which prohibits a state from imposing

> any requirement respecting any claim of the type described in section [343(r)(1) of this title], made in the label or labeling of food that is not identical to the requirement of section [343(r) of this title,] except a requirement respecting a claim made in the label or labeling of food which is exempt under section [343(r)(5)(B) of this title].

Since restaurant food is only partially exempt from federal regulation under Section 343(r)(B)(5), any state requirement for nutritional content labeling of restaurant food that is not identical to the requirements of 21 C.F.R. § 101.10, 101.9 and 101.45 is expressly preempted.[11]

Here, the prospective injunctive relief sought by plaintiff is clearly "not identical" to the federal regulatory requirements of 21 C.F.R. § 101.10 and § 101.45. Section 101.10 requires a restaurant to provide nutritional labeling information to a consumer only "upon request."

---

[11] There can be no real doubt but that the preemptive reach of Section 343-1(a)(5) extends to state tort claims as well as to state statutes and regulations. The Supreme Court indicated in Medtronic, Inc. v. Lohr, 518 U.S. 470, 509 (1996) (opinion of Justice O'Connor for four justices), 518 U.S. at 503-04 (concurring opinion of Justice Breyer), that the term "requirement" as used in another section of the Food, Drug and Cosmetic Act, 21 U.S.C. § 360(k)(a), encompasses state tort claims. See also Papike v. Tambrands, Inc., 107 F.3d 737, 741 (9th Cir. 1997). Moreover, the FDA has officially interpreted the term "requirement" as used in Section 343-1(a)(4) to preempt claims arising under state tort law. FDA Final Rule, 68 Fed. Reg. at 41498. This interpretation doubtless applies to preemption under Section 343-1(a)(5) as well, since there can be no meaningful distinction between the two subsections in this regard. Such agency interpretations of the preemptive scope of its governing statute are accorded great weight by the courts. See, e.g., Indus. Truck Ass'n, Inc. v. Henry, 125 F.3d 1305, 1311 (9th Cir. 1997); Colacicco v. Apotex, Inc., 432 F. Supp. 2d 514, 526 (E.D. Pa. 2006); Nat'l Home Equity Mortgage Ass'n v. Office of Thrift Supervision, 271 F. Supp. 2d 264, 272 (D.D.C. 2003). Indeed, plaintiff's injunctive relief claims under the DCCCPA sufficiently resemble direct state regulation that they would likely be preempted even if ordinary common law tort claims were not.

Plaintiff seeks a mandatory injunction requiring KFC to provide such information to all consumers prior to purchase, even in the absence of any consumer request. Section 101.45 affords a restaurant a broad range of options for communicating nutritional information including brochures supplemented by websites. Plaintiff would restrict those options to pre-purchase only methods such as food container labeling, menu boards or posters.

Indeed, express preemption aside, plaintiff's proposed injunctive relief would be precluded by the implied conflict preemption principles of Geier v. American Honda Motor Co., supra.[12] In Geier, the Supreme Court held that federal law preempted a product liability claim under D.C. law in which the plaintiff contended that a car manufacturer should have provided a driver's side airbag. The Court found that federal standards "deliberately provided the manufacturer with a range of choices among different passive restraint devices," and that by seeking to restrict that range of choices, plaintiff's tort claim conflicted with the federal standards. Id. at 875, 881. Similarly, when restaurants make nutrient content claims in the labeling of their food, federal law provides them with a range of options for making that information available to customers. Plaintiff's effort to restrict those options impermissibly conflicts with federal law and therefore is preempted.

---

12 Implied conflict preemption may apply even if the statute in question contains an express preemption clause. Freightliner Corp. v. Myrick, 514 U.S. 280, 288-289 (1995).

CONCLUSION

For the foregoing reasons, the Complaint should be dismissed in its entirety, with prejudice.

Dated: New York, New York
August 3, 2006

Respectfully submitted,

DEBEVOISE & PLIMPTON LLP

/s/ Roger E. Podesta

By: Roger E. Podesta
Mark P. Goodman
Erich O. Grosz
(admitted pro hac vice)

919 Third Avenue
New York, N.Y. 10022
Tel: (212) 909-6000
Fax: (212) 909-6836

/s/ Ada Fernandez Johnson

By: Ada Fernandez Johnson
(Bar No. 463296)

555 12th St., N.W.
Suite 1100E
Washington, D.C. 20004
Tel: (202) 383-8000
Fax: (202) 383-8118

Attorneys for Defendant Yum! Brands, Inc.